[No. 2072.]

BOB SCOTT *v.* THE STATE.

1. PRACTICE.— CIRCUMSTANTIAL EVIDENCE, as a general rule, cannot be resorted to for the purpose of establishing an issue in a criminal case when it appears that primary evidence of the same fact exists. This rule, however, does not apply when, from the nature of the case, it appears that the positive testi-mony could not possibly be had. The contested issue in this case was the defendant's recent possession of the stolen property, of which issue the only direct evidence was that of witnesses who resided in the Indian Territory, beyond the process of the courts of this State. *Held*, that, in view of the facts, circumstantial evidence to prove the issue was admissible.

2. SAME — BURDEN OF PROOF.— If, in order to secure a conviction, the State relies alone upon circumstantial evidence, it has the burden of establishing every circumstance essential to the conviction, as though each was the main issue in the case; and each incidental, equally with the main, fact must be established beyond reasonable doubt. See the opinion and the statement of the case for evidence *held* insufficient to establish against the defendant an inculpatory possession of the alleged stolen property, and hence, in view of the controlling importance of that issue in this case, insufficient to support a conviction for theft.

3. SAME — THEFT — CHARGE OF THE COURT.— See the statement of the case for a requested charge *held* applicable to the facts proved, and which, therefore, should have been given, but the refusal of which is *held* not to be reversible error in view of the general charge given to the jury.

APPEAL from the District Court of Parker. Tried below before the Hon. R. E. Beckham.

The conviction in this case was for the theft of a horse, the prop-erty of B. H. Smith, in Parker county, Texas, on the 28th day of April, 1885. A term of seven years in the penitentiary was the penalty assessed against the appellant.

B. H. Smith was the first witness for the State. He testified that, in April, 1885, he was living at the house of J. N. Frazier, near Agnes, in the county of Parker. On the night of the 28th day of that month, the witness's horse was taken without his consent from the said Frazier's lot. The witness missed his horse on the next morning, and tracked him about six miles in a northern direc-tion. At intervals along the trail the tracks of the horse were not discernible, but they were plainly tracked the larger part of the distance named. Witness trailed the track of another horse along with the track of his horse, and, for about a mile from the lot from which his horse was taken, the track also of a small pony. The pony track soon disappeared, and witness could not ascertain the direction in which it went. The witness's horse, and the horse

whose track was trailed with it, were shod in front.  The witness was certain that one of the tracks followed by him was the track of his horse.  Witness's horse was a chestnut sorrel in color, and a good-sized animal.  Witness was unable to say who took his horse from Frazier's lot.  J. N. Frazier brought the horse back to witness about three weeks after it was taken.

J. N. Frazier, for the State, testified to the same facts related by the witness Smith, and, in addition, that he instituted search for the horse and pursuit of the thief.  He went first in the direction of Jacksboro, in Jack county.  Returning to his house from Jacksboro, he went north *via* Decatur in Wise county to Red River Station, where he met and talked with Messrs. Yates and Reed, who were present to testify on this trial.  From Red River Station witness went to Erin Springs in the Indian Nation, which point was about one hundred miles distant from Red River Station.  At Erin Springs the witness found the horse of Jack Shadle, which horse was stolen on the same night that Smith's horse was stolen.  He found Shadle's horse in the possession of one Robert O'Neal.  Thence witness went west to the "Q. U." ranche, in the Indian Nation, and there left a description of the defendant, and of J. A. Alexander, and also of Smith's horse.  He then proceeded west about fifteen miles, but returned next day to the "Q. U." ranche, where he found defendant and Alexander under arrest, and in a guard-house.  He found Smith's horse hitched about fifteen feet from the guard-house.  Some twenty-five persons and several horses were standing about the ranche.  Witness secured the horse and the prisoners, and returned to Parker county.  On the first night out, while the witness was on guard, the defendant got up from his pallet, stepped out from camp, said "good night, boys," and made his escape.  Some of the parties having charge of the prisoners along with the witness talked somewhat of lynching the prisoners, but witness opposed such action, and declared that they should not be hurt.  Witness got home with the horse some time in May, 1885.  Erin Springs, where witness found the Shadle horse, was on the direct route from Red River Station to the "Q. U." ranche.  The defendant lived with his father in the witness's neighborhood, but witness had not seen him for a week or ten days prior to the theft of Smith's horse.  Previous to this theft, for some time, the defendant had worked on a ranche out west.  Shadle's horse was taken from his residence, about a mile distant from the witness's house, on the same night that Smith's horse was taken.  Witness did not see Alexander during the several days next preceding the night of the theft.

M. Yates was the next witness for the State. He testified that he was a blacksmith by trade, and lived at Red River Station, on the Red river, in Montague county, Texas. On the 1st day of May, 1885, he saw two young men at Red River Station, going towards the river. One was riding a black or brown horse, and the other a chestnut sorrel. Witness talked with them about five minutes, but did not know either. He was not nearer them than ten or fifteen steps. Witness was brought to court under attachment. He was taken to the jail in Weatherford on his arrival to see if he could identify either of the parties held for the theft of Smith's horse, as one of the parties he saw at Red River Station. He failed to identify Scott and Alexander as the two young men he saw at the station. He then went to a wagon-yard in Weatherford, where he saw two horses which he identified as the two horses he saw in possession of the two young men at Red River Station, on the 1st day of May, as stated. Witness picked those two horses out from a large number of others, and knew them to be the horses he saw in the possession of the young men. Those horses belonged to Smith and Shadle.

Seborn Reed testified, for the State, that he lived at Red River Station. On or about the 1st day of May, 1885, he saw two young men, one riding a black or brown horse, and the other a chestnut sorrel, pass through Red River Station, going in the direction of the river. They passed the witness at the distance of about one hundred yards, and it was then nearly dark. After they had passed the witness some little distance, one of them returned to the back part of the lot in which the witness was then at work, and requested witness to go with him and show him the ford of the river. That man then stood about ten steps from the witness, across a calf-lot. Witness had never seen the parties before, and did not know them. Witness was brought to court as an attached witness. On his arrival in Weatherford, he went to the jail to see if he could recognize there the parties he saw pass through Red River Station on May 1, 1885. He and Yates went into the cage, and witness recognized J. A. Alexander as the man with whom he talked at Red River Station, but failed to recognize the defendant as the other party. He went back into the cage a second time and verified his identification of Alexander. He was then taken to the wagon-yard and recognized a black horse as one of the horses he saw at the station, but could not swear to the identity of the sorrel horse.

B. H. Smith, recalled by the State, testified that a horse pointed out by Yates at the wagon-yard, as one of the horses he saw at

Red River Station on May 1, 1885, was his horse, and the same animal that was stolen on the night of April 28, 1885.

Jake Shadle testified, for the State, that his horse was stolen from his horse-lot near his house, in the same neighborhood in which B. H. Smith lived, on the same night that Smith's horse was stolen. Witness trailed his horse and another horse, shod before, as his horse was, some six or seven miles in a north direction. For a short distance those two horse-tracks were attended by the tracks of a pony. Witness found his horse some time in May, in the possession of Robert O'Neal, at Erin Springs, in the Indian Territory. That was the same horse afterwards identified by Yates and Reed in the wagon-yard. Witness had not seen either the defendant or Alexander in his neighborhood for a week or ten days prior to the theft.

Mr. Phillips testified, for the State, that, on the morning of April 27, 1885, he saw Alexander and another man whom he did not then recognize, in Wise county, about five miles from the residences of Frazier and Shadle, going in a westerly direction. A week or two before that he saw the defendant, alone, in the neighborhood. Defendant said that he was there to brand his cattle and get ready to go west again, where he had been on a cattle ranche.

Mr. Allen testified, for the State, that he lived in Wise county, some twelve or fourteen miles distant from the residences of Frazier and Jake Shadle. On the morning of April 28, 1885, defendant and Alexander, who were camped at a school-house near witness's house, hired witness and his brother-in-law, Thornton, to hunt their horses, which they said were lost. Witness and Thornton found the said horses about noon. One was a black pony and the other a sorrel horse, but they were not the horses pointed out in the wagon-yard by Yates and Reed as the horses of Smith and Shadle. They left the witness's house about 2 o'clock on the said 28th day of April, 1885, going west along the public road towards Jacksboro. They told the witness that they had gone into camp at the school-house to wait for the overflow in the river to subside, before pursuing their journey to a ranche out west. The road to Jacksboro, which defendant and Alexander took when they left, did not cross the river. State's witness Thornton corroborated the testimony of Allen.

State's witness Hubbard testified that he lived in Wise county, about fifteen miles from the Frazier and Shadle neighborhood. The defendant and J. A. Alexander spent the night of April 21, 1885, at his house, a severe rain falling on that night. On the next morning the defendant told witness that his name was Franklin

and that he lived at Springtown, and he invited witness to stop at his house in passing. The defendant and Alexander were then riding, one a black and the other a sorrel horse, but not the Smith and Shadle horses.

State's witness Thetford testified that he lived in Wise county, in the same neighborhood with the witness Allen. He saw the horses of the defendant and Alexander on the day that Allen and Thornton found them. He saw defendant and Alexander camped near Allen's several days before then.

State's witness Mays testified that, on the morning of April 29, 1885, he found a knife in the lane running east and west near Jim Shadle's place, which place was in Wise county, seven or eight miles north from Jake Shadle's house in Parker county. The knife exhibited in evidence was the knife so found by the witness.

State's witness Culwell testified that on the evening of Sunday, April 26, 1885, he saw Alexander about a mile and a half north of Frazier's place, going north. He was alone, riding a small black pony. On the following Saturday witness saw that same pony near Willow Point in Jack county, in the possession of Alexander's little brother. Defendant lived with his father near Springtown, and about two miles from Jake Shadle's. His name was Robert Franklin Scott. Witness had never heard him called Franklin. J. A. Alexander's father lived in Jack county, near Willow Point, and about twenty miles from Jake Shadle's.

Warren Bond testified, for the State, that he had seen the knife in evidence in the possession of the defendant. Subsequent to that time defendant told him that he had given the knife to J. A. Alexander, and, in February, 1885, subsequent to that information, the witness saw the knife in the tray of Alexander's trunk. Some of the pearl sets in the handle of the knife which he saw in Alexander's trunk were lost, and the spaces from which they were lost corresponded with the vacant pearl spaces on the handle of the knife in evidence. Witness was morally satisfied of the identity of the knives, but would not absolutely swear they were the same. Witness had often been at defendant's house, and had always heard him called Bob and never Franklin. The State closed.

John Coffey was the first witness for the defense. He testified that J. A. Alexander lived at his house during the winter of 1884–85. Alexander had a knife at that time which sometimes hung on the wall and at other times was kept in the tray of the trunk. That knife had the letters B. O. B. engraved on one side of the handle. The knife in evidence was a different knife. It was smaller, and did not have the letters mentioned engraved on the handle.

G. F. Scott, the defendant's father, testified, for the defense, that the defendant left his house near Springtown on the 21st day of April, 1885, and witness did not see him again until after his arrest. Defendant's given name was Robert Franklin, and he was sometimes called Franklin by the members of his family. Defendant owned a small bunch of cattle on the edges of Wise and Parker counties. Defendant was not at home on the 28th day of April, 1885. The county attorney asked witness where the defendant was on the night of April 28, 1885, and witness answered that "it was none of his business where he was."

The special charge referred to in the third head-note of this report reads as follows:

" To sustain a conviction it should appear not only that an offense as charged has been committed, but there should also be proof tending to establish that the party charged was the person who committed it, or was a participant in its commission, to a degree of certainty greater than a mere probability or strong suspicion. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him."

The motion for new trial raised the questions discussed in the opinion.

*Lanham & Stephens*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Hurt, Judge. This appeal is prosecuted from a judgment convicting the defendant of the theft of a horse, the property of one B. H. Smith. There is but one question presented by the record here that need be considered, as it is the only one of any importance in the case.

The case is one entirely dependent upon circumstantial evidence, and the State relied upon recent possession by defendant of the horse alleged to have been stolen. The only evidence found in the record which in any manner tends to show such possession is contained in the testimony of the State's witness Frazier, which is in substance as follows:

He, the witness, went to the Q. U. ranche in the Indian Territory, and there left a description of Bob Scott and J. A. Alexander, and also of the Smith horse. He then went on about fifteen miles, and returned on the next day to the said ranche, where he found the defendant and J. A. Alexander under arrest, and also found the

horse of B. H. Smith hitched about fifteen steps off, the prisoners being in a house and under guard.

After this evidence was adduced, the defendant's counsel moved to exclude it from the consideration of the jury on the ground that it was incompetent in this, that it was an attempt on the part of the State to prove the possession of the horse by defendant by circumstantial evidence, when the evidence itself disclosed the fact that better and direct evidence existed. The motion to exclude was denied, and to this ruling the defendant excepted and saved his bill.

This transaction was in the Indian Nation, beyond the process of the courts of this State in a criminal case, unless in a case of a deposition on behalf of a defendant. As a general proposition, the position of appellant is well taken; but the rule is that "positive evidence is always required when from the nature of the case it appears it might possibly have been had." (1 Bl. Com., Book 3, side page 371.)

The witnesses by whom this positive proof could have been made being beyond the jurisdiction of the court, the State was relieved of the necessity of producing such evidence, and hence the fact that defendant was in possession of the horse could be shown by presumptive evidence. The court did not err in refusing to exclude it from the consideration of the jury.

However, after having thoroughly examined the evidence in this case, we have not discovered any fact creating a serious suspicion against defendant, save those contained in the testimony of the witness Frazier, and which occurred at the Q. U. ranche, as above stated; and while, under the facts of the case bearing upon this point, we hold that the State could, by circumstantial evidence, prove that defendant was in possession of the stolen horse, still the circumstances by which this fact is attempted to be shown must be so cogent and conclusive as indeed to establish the fact, that is, that defendant was in possession of the stolen horse. It will be found from an inspection of the statement of facts that the other criminative facts are so slight, unsatisfactory and uncertain in their tendency, that, for the evidence to be sufficient to support this conviction, proof of recent possession by the defendant must be made; and, while this proof may be made by circumstances, yet the circumstances — facts from which this fact of possession is sought be inferred — must warrant this inference, *and no other.*

Proof of the possession by defendant being *essential* to this conviction, owing to the weakness of the other criminative facts, the party upon whom the burden of proof rests is bound to prove every single circumstance which is essential to the conclusion, in

the same manner and to the same extent, as if the whole issue rested upon the proof of each individual and essential circumstance. (*Lehman* v. *The State*, 18 Texas Ct. App., 174.) If the State has shown that defendant was in possession of the horse, this fact, taken in connection with the other circumstances, though slight, would be sufficient to sustain this conviction. But has the State shown this possession by defendant?

Frazier described Alexander and defendant, and also the horse. He left and went about fifteen miles, and when he returned next day to the ranche he found Alexander and defendant in a house, prisoners, the horse being hitched off some fifteen steps. Now, who hitched the horse at this place? Did Alexander or defendant? If so, which? Or, was Alexander found in possession when arrested? Or, was defendant found with the horse when he was arrested?

There were some twenty-five people at the house when Frazier returned. May not some of these persons have hitched the horse near the house? Who can tell with any degree of certainty?

This is an important matter, and under the rule there should be no uncertainty about it. As before stated, the State, from the other though slight criminative circumstances, by no means sufficient within themselves, and recent possession by defendant, proposes to infer or presume that main fact,— to wit, that defendant took the horse; and thus establish his guilt. The main fact must be established beyond reasonable doubt, and hence the facts from which the main fact is to be presumed, if essential, must be proved beyond a reasonable doubt; and we have seen, under the circumstances of this case, that proof of possession in defendant is an essential fact, and hence the necessity of proof of possession by defendant is absolute; because no conclusion can be more certain than the facts from which it is made or deduced. We are therefore of the opinion that the evidence is not sufficient to support this conviction.

While we do not determine that there was such error in refusing the first special instruction asked by defendant as would require a reversal of the judgment, still it was not an inappropriate charge, but on the other hand quite applicable to the peculiar character of this case, and, if not in effect embraced in the main charge, should have been given as requested.

The other questions presented are not likely to arise on another trial. Because the verdict is not supported by the evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered November 14, 1885.]